WELLS, Judge.
Chris Taylor, M.D., the defendant below, appeals from a non-final order denying his motion to dismiss for lack of personal jurisdiction. Because the trial court erred in determining that Dr. Taylor’s contacts with the State of Florida were sufficient to confer general jurisdiction over him under Florida’s long arm statute, section 48.193(2) of the Florida Statutes (2011), and because federal due process considerations were not met, we reverse.
On May 29, 2010, Hilda Patricia Gutierrez and her husband embarked on a seven night cruise aboard Royal Caribbean Cruise Line’s Oasis of the Seas. A couple of days into the cruise, Gutierrez visited the ship’s medical facility as it was approaching Labadee, Haiti, complaining of severe abdominal pain. She was seen by a ship’s nurse and Dr. Taylor, a shipboard physician. Dr. Taylor diagnosed and treated her for gastritis. Her condition worsened and, upon reaching port in Mexico, Gutierrez disembarked the ship and went to a Mexican hospital where she underwent abdominal surgery. There, she was allegedly treated for abdominal sepsis and multiple organ failures. She thereafter suffered a cerebral hemorrhage.
On May 27, 2011, Gutierrez filed the underlying negligence action against Dr. Taylor and Royal Caribbean Cruises, Ltd. in the Miami-Dade Circuit Court. With respect to personal jurisdiction, the complaint alleged, in relevant part, that the circuit court had general jurisdiction over Dr. Taylor — a British citizen who does not live in Florida, does not own real property in Florida and who is not licensed to practice in Florida — because of his “substantial and not isolated activity within the State of Florida,” as evidenced by his contacts with the State in connection with his career position as a shipboard physician for Florida-based cruise lines. No allegations were made in the Amended Complaint regarding any medical treatment performed by Dr. Taylor with respect to Gutierrez either in the State of Florida or within Florida territorial waters.
Dr. Taylor moved to quash service of process, to dismiss for lack of personal jurisdiction and to dismiss for failure to state a cause of action. He also participated in jurisdictional discovery — i.e., responding to jurisdictional interrogatories and attending a deposition via Skype. The matter then came before the lower court for hearing on October 9, 2012. Therein, the parties agreed that the court should defer ruling on the motion to quash service and focus solely on the two motions to dismiss.
On October 16, 2012, the court below entered the order on appeal. Therein, the court denied the motion to dismiss for failure to state a cause of action. That ruling is not the subject of this appeal. The court also denied the motion to dismiss for lack of personal jurisdiction, finding that while specific jurisdiction did not exist over Dr. Taylor under Florida’s long arm statute, see section 48.193(1)[1], it nevertheless had general jurisdiction over him under the following provision of the statute:
A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly *418 interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.
§ 48.193(2), Fla. Stat. (2011).
The court based its finding of general jurisdiction on the following contacts between Dr. Taylor and the State of Florida, all of which relate to his nine-year career as a shipboard doctor: entering into employment agreements in Florida with Florida-based cruise lines (Carnival Cruise Lines and Royal Caribbean Cruise Lines); attending annual medical conferences in Florida and from time to time making presentations at same; receiving advanced cardiac life support recertification in Florida; vacationing from time to time in Florida; having two bank accounts in Florida; and working aboard a cruise ship that embarked/disembarked at a Florida port one day a week. In addition, because for all intents and purposes Dr. Taylor worked and resided exclusively on a cruise ship, the trial court felt compelled to relax both the stringent jurisdictional standard required under Florida’s long arm statute and the constitutional analysis set forth in the well-established case law in order to redress what it clearly deemed a nefarious scheme by Dr. Taylor to avoid being sued not only in a Florida court, but in any court:
This court is cognizant of the technology now available to people all over the world that enables them to conduct their life’s business without being “tethered” to a particular locale. For that reason, the court cannot simply rely on the standard “brick and mortar” factors in determining whether an individual has sufficient contacts in Florida to establish jurisdiction (e.g., physical location of office, home, etc.). In an age where people across the globe have access to fax machines, emails, cell phones, Skype and other advances, almost anyone could run a business from an igloo or a grass hut as long as they have satellite capabilities. For that reason, the courts should have a broader view of what constitutes a “connection” and not allow defendants to live their lives as nothing more than a shell game to thwart jurisdiction.
We review the trial court’s denial of the motion to dismiss for lack of personal jurisdiction de novo. See E & H Cruises, Ltd. v. Baker, 88 So.3d 291, 293 (Fla. 3d DCA 2012).
Setting aside the trial court’s opinion that Dr. Taylor has consciously engaged in a “shell game to thwart jurisdiction” — which is far from an established fact on this record — we find that none of the factors relied upon by the trial court, whether viewed individually or collectively, are sufficient to confer general jurisdiction over him. Indeed, contrary to the trial court’s expressed desire to employ a relaxed, “broader” view of general jurisdiction, it is well settled that “the requirement of continuous and systematic general business contacts establishes a ‘much higher threshold ’ than the ‘minimum contacts’ required to assert specific jurisdiction.” American Overseas Marine Corp. v. Patterson, 632 So.2d 1124, 1127-28 (Fla. 1st DCA 1994) (emphasis added) (quoting Reliance Steel Products Co. v. Watson, ESS, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir.1982)); see also Biloki v. Majestic Greeting Card Co., Inc., 33 So.3d 815, 820 (Fla. 4th DCA 2010) (“General jurisdiction requires far more wide-ranging contacts with the forum state than specific jurisdiction, and it is thus more difficult to establish.” (quoting Canale v. Rubin, 20 So.3d 463, 466 (Fla. 2d DCA 2009))); Elmlund v. Mottershead, 750 So.2d 736, 737 (Fla. 3d DCA 2000) (recognizing that section 48.193(2) “requires a substantially heightened degree of Florida *419 activity,” and finding no general jurisdiction over a shipboard physician who had “incidental, almost entirely personal contacts with this state between voyages”). The “continuous and systematic business contacts” required to confer general jurisdiction must be “ ‘extensive and pervasive, in that a significant portion of the defendant’s business operations or revenue [are] derived from established commercial relationships in the state.’” Caiazzo v. Am. Royal Arts Corp., 73 So.3d 245, 259 (Fla. 4th DCA 2011) (quoting Trs. of Columbia Univ. in City of N.Y. v. Ocean World, S.A., 12 So.3d 788, 793 (Fla. 4th DCA 2009)); Patterson, 632 So.2d at 1127-28. The facts alleged and established here simply fall short of these mandates.
Entering into an employment agreement in Florida, even an agreement that acknowledges Florida as the only place where disputes arising under the agreement may be entertained and which indemnifies the Florida “employer,”[2] does not confer general jurisdiction over an individual. See Biloki, 33 So.3d at 821 (denying general jurisdiction where it was alleged, in part, that the defendant had signed several employment agreements in Florida, recognizing that there “needs to be more than a contractual relationship for general jurisdiction to apply”); Barnett v. Carnival Corp., No. 06-22521-CIV, 2007 WL 1526658, at *4 (S.D.Fla.2007) (finding that the forum selection clause contained in a shipboard doctor’s employment agreement did not confer general jurisdiction because the plaintiff was not a signatory to the agreement); Farrell v. Royal Caribbean Cruises, Ltd., No. 11-24399-CV, 2013 WL 178367, at *2 (S.D.Fla.2013) (finding no general jurisdiction where ship’s nurse had appointed cruise line “as her exclusive agent in Florida by way of their employment/indemnification agreements”).
Attending annual industry conferences in Florida and securing medical certifications issued by the State of Florida during those conferences also does not confer general jurisdiction. See E & H Cruises, Ltd., 88 So.3d at 294 (attending annual networking events and conventions in Florida found insufficient to confer general jurisdiction); Farrell, 2013 WL 178367, at *2 (obtaining medical education in Miami insufficient to confer general jurisdiction over shipboard nurse). This is particularly so in this case. As Dr. Taylor without contradiction confirmed, these conferences were conducted in Miami by the Miami-based cruise lines with which he contracted. While Dr. Taylor testified that he could have refused to attend these conferences or to speak at them, “it wouldn’t have been looked upon favorably” by the companies which contracted his services. Moreover, the conferences were geared to and attended primarily by cruise ship physicians and nurses, and importantly provided courses necessary to secure essential certifications. Specifically, Dr. Taylor testified that he took courses and training which allowed him to secure at least one of the certifications — the ACLS (advanced cardiac life support) certification — that was required for him to work aboard a cruise ship. As case law confirms, these activities did not confer general jurisdiction over Dr. Taylor.
Of course, vacationing in Florida is insufficient to confer general jurisdiction over a person. See Two Worlds United v. Zylstra, 46 So.3d 1175, 1178 (Fla. 2d DCA 2010) (holding that coming “to Florida only *420 a few times a year to visit friends and family” was insufficient to satisfy section 48.193(2) and due process requirements); Radcliffe v. Gyves, 902 So.2d 968, 972 n. 4 (Fla. 4th DCA 2005), disapproved on other grounds, Kitroser v. Hurt, 85 So.3d 1084, 1089-90 (Fla.2012) (finding that “sporadic or occasional family vacations” to Florida are “insufficient” to establish general jurisdiction under Florida’s long arm statute). Similarly, having a Florida bank account is not enough. See Int'l Textile Grp., Inc. v. Interamericana Apparel Co., No. 08-22859-CIV, 2009 WL 4899404, at *2 (S.D.Fla.2009); E & H Cruises, Ltd., 88 So.3d at 294; La Reunion Française v. La Costeña, 818 So.2d 657, 659 (Fla. 3d DCA 2002). The testimony regarding Dr. Taylor’s two accounts at Bank of America was that in 2006, Bank of America representatives came on board the Carnival cruise ship on which Dr. Taylor was then working to encourage cruise line employees to open accounts. Although Dr. Taylor was always paid in cash while at sea and deposited his salary in a bank account on the Isle of Jersey, Bank of America made opening a new account so easy that he opened two accounts believing it might prove convenient. According to Dr. Taylor he maintained only a minimum balance and made use of only the debit card attached to the accounts. When the debit card expired, Bank of America required him to provide a new address before it would issue a new card.[3] To satisfy this demand, he provided the Miami address of his friend and former manager at Carnival Cruise Lines, Steve Williams, who had recruited him to work for Royal Caribbean. We agree with Dr. Taylor that neither maintaining these accounts, see La Reunion Française, 818 So.2d at 659, nor engaging in any of the other activities detailed above, whether considered alone or together, constitute the continuous and systematic contacts necessary to establish general jurisdiction over him.
The record is that Dr. Taylor is a citizen of Great Britain where he was born, raised, attended medical school, and still has family. Dr. Taylor has never resided in Florida; he has never owned or rented real property in Florida; he is not licensed to practice medicine here; and he has never owned or operated a business (or medical practice) in this State. The crux of the matter therefore falls upon the last factor relied on by both the court below and our dissenting colleague, that is, the fact that the foreign flagged vessel on which Dr. Taylor works returns to its Florida home port for the embarkation/debarkation process one day a week, during which time Dr. Taylor may or may not see passengers and crew members in some limited capacity as a shipboard doctor.
To this end, the record establishes that the ship’s medical center is closed on the morning on which the ship returns to its Florida home port to disembark passengers. However, should an emergency arise while the ship is returning to port, emergency treatment is rendered either by Dr. Taylor or any other ship’s doctor who may be on duty at the time[4]:
Generally speaking, the ship’s medical center is closed when the ship is in ... the home port day.... There will be *421 occasions when emergencies happen ... on the last few hours of the cruise on the — prior to arrival, where emergency care has to be rendered.
The ship’s medical center then remains closed until some unspecified time during the evening after the ship has left port. And, while either Dr. Taylor or any other ship’s doctor would provide emergency medical care to either passengers or crew while the ship is departing, the medical clinic was open for that one hour on the evening of departure primarily to care for crew members since passengers generally would not have been on board long enough to become seriously ill:
The medical center is usually open just for one hour in the evenings [on embarkation day], which 99 percent of the time is simply for crew members because most of the guests have only been onboard by that time a couple of hours, which is generally not enough time to become significantly ill.
Thus, while there is no evidence that Dr. Taylor actually treated any passenger or crew member while in Florida or its territorial waters, the evidence shows that it is likely, as Dr. Taylor candidly admitted, that he rendered emergency treatment to someone in Florida territorial waters while coming into or going out of port:
Q. So you have provided medical care in the State of Florida onboard the Royal Caribbean ships, Correct?
MR. FRIEDMAN [COUNSEL FOR DR. TAYLOR]: Objection to form.
[DR. TAYLOR]: There will have been occasions, I’m sure.
BY MS. MEISTER [COUNSEL FOR GUTIERREZ]:
Q. So you’re not denying that you provided medical care to patients in the State of Florida, correct?
A. On an emergency basis, that is correct.
Q. What about the crew members, didn’t you see crew members while in the State of Florida on a nonemergency basis, that were sick or had an injury or for whatever reason need to see a doctor?
A. The ship’s medical center was generally open one hour on embarkation day, which I’m no expert on the nautical miles, but that was probably within Florida territorial waters.
Q. So for that one hour, you would treat patients while the ship was likely in Florida territory waters, correct?
A. That could be the case, yes.
Q. Was that ever not the case?
[[Image here]]
[DR. TAYLOR]: Yes, very much so, because when there’s more than one doctor on the ship, not every doctor is working the clinic. So if it’s a two-doctor ship, you may only work that clinic every other week.
(Emphasis added).[5]
This is not the “stuff’ that general jurisdiction is made of since it is neither contin *422 uous nor systematic and, thus, does not satisfy the stringent requirements of either section 48.193(2) or the due process considerations set forth by the United States Supreme Court in Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).[6] See Caiazzo, 73 So.3d at 252 (finding that “substantial and not isolated activity” set forth in section 48.193(2) is the functional equivalent to “continuous and systematic general business contacts,” and that “[b]ecause substantial, continuous, and systematic business contacts is the standard for both subsection (2) of Florida’s long-arm statute and the due process requirement for general jurisdiction, a finding of substantial, continuous and systematic business contacts will satisfy both the long arm statute and the due process requirements of Helicópteros ”); Farrell, 2013 WL 178367 at *4 (confirming that although a ship “carrying” the defendant nurse had docked in Florida 159 times, no evidence existed that she was on duty or had treated patients during some or all of those times).
To this end, we find Hesterly v. Royal Caribbean Cruises Ltd., No. 06-22862-CIV, 2008 WL 516495 (S.D.Fla.2008) particularly persuasive on this point. Hesterly similarly involved a Royal Caribbean cruise ship that returned to a South Florida port following a weeklong voyage for embarkation/disembarkation of passengers, with the ship being in Florida’s territorial waters for a total of approximately twelve hours, one day a week. Id. at *2. The record in that case established that the shipboard infirmary was open from 8:00 a.m. to noon while the vessel was in the Florida port, during which time the ship’s doctors were available to treat departing passengers for approximately two and half hours and crew members for the *423 entire four hours. Id. Furthermore, “[tjaking all inferences in favor of Plaintiff,” the trial court assumed that “the infirmary reopened as the new passengers boarded the vessel.” Unlike this case, the ship doctors in Hesterly maintained that they had never actually seen any passengers or crew members in the infirmary while it was within Florida’s territorial waters. Nevertheless, the court found that, even if the doctors had seen a few patients while the cruise ship was in Florida’s territorial waters, that it was “hard to imagine how this minimal activity could amount to substantial and not isolated general business activity in the State of Florida by foreign doctors treating seaman inside a foreign flagged vessel.” Id. at *10. Particularly since “the amount of time spent within Florida’s territorial boundaries during the doctors’s [sic] ... contracts was very minimal” and the doctor’s performed the majority of their medical services “on the high seas and at foreign ports of call.” Id. We find Hesterly sufficiently analogous to the instant matter and conclude that Dr. Taylor’s contacts with the State of Florida were not sufficient to confer general jurisdiction over him. See also Caiazzo, 73 So.3d at 259 (noting that “courts have found that a company’s level of business in Florida may be insufficient to constitute ‘continuous and systematic business activities’ when only a de minimis percentage of the total sales is derived from its sales to Florida”).
We also note that this case is not at all like Dean v. Johns, 789 So.2d 1072 (Fla. 1st DCA 2001), which found general jurisdiction existed over a non-resident doctor from Alabama. The doctor in that case, who practiced a subspecialty of neurology in Birmingham, Alabama, “always” accepted Florida patient referrals from a Florida doctor located in the Florida panhandle. Id. at 1075. The record further established that he had treated over 3,200 Florida patients; that he was licensed to practice medicine in Florida; that he had subjected himself to Florida regulations for the practice of medicine in Florida; that he regularly consulted with Florida physicians by telephone; that he gave reports to Florida physicians for use in treating Florida patients in Florida, and that he owned property in Florida. Id. at 1078. Based on all of these contacts with the State of Florida, none of which are present here, the First District found that section 48.193(2) and due process concerns were satisfied.
Accordingly, because Dr. Taylor’s contacts with the State of Florida were not sufficient to meet either Florida’s long arm statute, section 48.193, or the federal due process considerations set forth by the United States Supreme Court in Heli-cópteros, the court below erred in finding general jurisdiction over him. We therefore reverse the order denying Dr. Taylor’s motion to dismiss for lack of personal jurisdiction, and remand with instructions to enter an order of dismissal.
Reversed and remanded with instructions.
SHEPHERD, C.J., concurs.

. Gutierrez does not appeal the trial court’s determination that specific jurisdiction does not lie in this case. Even if she did, we would affirm this finding as the record demonstrates that Dr. Taylor did not provide any medical services to her in Florida or within Florida territorial waters. See Small v. Chicola, 929 So.2d 1122, 1124 (Fla. 3d DCA 2006) (finding the trial court did not have specific jurisdiction over a shipboard doctor where the record demonstrated the plaintiff was not treated in Florida territorial waters).

. Dr. Taylor contracts with Royal Caribbean (and earlier with Carnival Cruise Lines) as an independent contractor. Dr. Taylor, who has • been to Royal Caribbean’s headquarters only once while waiting to board a ship, does not negotiate these contracts with Royal Caribbean. He either accepts them or does not and receives and signs them while at sea.

. The address that appeared on the initial account statements was that of Carnival's corporate headquarters, located in Doral, Florida.

. Dr. Taylor testified that he is not always the only ship physician on board and that if the ship is a two physician ship, he will be on call on these occasions only every other week. Steve Williams, Director of Fleet Medical Operations for Royal Caribbean, testified that large ships like the Oasis of the Seas have three physicians and five nurses on board who share these duties.

. Steve Williams, Director of Fleet Medical Operations for Royal Caribbean, confirmed this testimony in his own deposition:
Q. ... Were there designated medical center hours?
A. Yes.
Q. Okay. What were those hours?
A. Typically when the ship was at sea or outside its home port, they would be 8 in the morning till 11. And then in the afternoon it would be from 3 to 6, or 4 to 7, depending on the itinerary and the port.
[[Image here]]
Q. Now, you indicated those hours were when the vessel was at sea. What were the clinic hours on embarkation, debarkation dates?
A. Typically the clinics will be closed in the mornings, so when the ship comes into the home port, the clinic is not open. And *422 then typically the clinic would open in the afternoon, usually just for a couple hours between 5 and 7 and that would be typically after the ship has left port.
[[Image here]]
Q. If I understand correctly, Royal Caribbean allows its ship’s physicians to perform medical service aboard its vessel, which is foreign flagged, in Florida ports and in Florida waters, limited to onboard the vessel; is that fair?
A. Well, yeah, I mean, our physicians and nurses are expected to respond to medical emergencies when they're on the vessel, especially if it's an emergency....
Q. Okay. And it’s not just medical emergencies, because they have clinic hours where they provide non-medical emergency medical treatment also, I mean, someone got a cut on their hand and they need a few stitches — I don't know, maybe that's not a good example. But—
A. Let me help you.
Q. Okay, thank you.
A. Typically, no. Because, for instance, you mentioned Florida. When the OASIS is in port in Florida, the clinic isn't open, so we don't have a clinic in the morning and the clinic in the afternoon is usually [open] after the ship has left.
Because when the ship is getting ready to leave, there are all sorts of drills and things that happen to guests and crew, so it’s a busy time. So typically our clinic hours are after the ship has left.
Now, at what point the ship is three miles off the coast, I don't know. But I would say, generally speaking, there aren’t that many non-emergency things happening in the medical center that the physicians are involved with, while the ship is in Florida state water, if that helps.

. The Helicópteros court found insufficient to satisfy the continuous and systematic general business contacts needed to support general jurisdiction over a Columbian company evidence that the Columbian company had sent its chief executive to Texas to negotiate a contract; accepted checks into its New York bank account drawn on a Texas bank; purchased millions of dollars in helicopters and equipment from Texas; sent pilots to Texas for training and to ferry purchased helicopters to South America; and sent management and maintenance personnel to Texas for training and consultation.